Sarah M. Lockwood
TIPP COBURN & ASSOCIATES PC
2200 Brooks Street
Missoula, MT 59806
Phone:  (406) 549-5186
Facsimile:  (406) 721-1892
sarah@tcsattorneys.com

*Attorney for Defendant Savannah Smith*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br>vs.<br><br>SAVANNAH SHOSHANA SMITH<br><br>                              Defendant. | Case No. CR-21-52-M-DLC<br><br>**DEFENDANT SAVANNAH SMITH'S SENTENCING MEMORANDUM** |

COMES NOW Defendant Savannah Smith, by and through her counsel of record, Sarah M. Lockwood of TIPP COBURN & ASSOCIATES PC, and hereby respectfully files this memorandum in anticipation of her sentencing hearing on January 12, 2022.

//

//

//

I.  **INTRODUCTION**

Savannah Smith (hereafter "Savannah ") has accepted responsibility for possession with the intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B) and 18 U.S.C. § 2 (Count I), and being a drug user and addict in possession of firearms in violation of 18 U.S.C. § 922(g)(3)(Count II).

The drug offense carries a mandatory minimum of 5 years and maximum prison term of 40 years for the methamphetamine, and a $5,000,000.00 fine. As to the fentanyl, the maximum term of incarceration is 20 years on Count I. There is a $100.00 special assessment.

The firearms offense carries a maximum prison term of 10 years and a fine of $250,000.00. Savannah also admitted the forfeiture allegation. This Honorable Court accepted Judge DeSoto's findings and recommendations as to Savannah's guilty pleas in an Order dated May 25, 2022.

If the plea agreement is accepted by the Court, the Government will move to dismiss the underlying Indictment and the Government will agree to decrease Savannah's offense level by two-levels for acceptance of responsibility under U.S.S.G. §3E1.1(a) and a one-level reduction for timely notification of plea under U.S.S.G. §3E1.1(b). PSR at ¶ 7.

The Presentence Investigation Report (hereafter "PSR") erroneously assumes that Savannah played an equal role in the offense as her codefendant, Carlos Aguirre (hereafter "Aguirre") and holds her accountable for all of the drugs and guns seized from his personal property, which were being temporarily kept in a storage area of her home on October 6, 2022. PSR ¶ 82.

In reality, by the time of her arrest, Savannah had taken significant steps to withdraw from the conspiracy. She voluntarily quit using illegal drugs, enrolled in a suboxone program, and she secured a new home where Aguirre was not permitted to reside. *Exhibit A*, Dr. Scolatti Evaluation, pg 9, ¶ 1-3, PSR ¶¶ 27, 82, 85, 93, 98.

Savannah also maintains that she was unaware that Aguirre was taking her guns and diverting them to gang members in California. The Government cannot prove her knowledge or involvement in this part of the conspiracy. Because this enhancement would have a disproportionate effect on her sentence, the government must prove the enhancement by a clear and convincing standard. See *e.g. United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999). This same reasoning applies to the fentanyl and fentanyl analogue. Although Aguirre was apparently selling fentanyl and its analogue as a part of the conspiracy, Savannah was not even aware of what fentanyl

analogue was until it was explained in the context of the PSR. No evidence linked Savannah to selling or trading fentanyl or otherwise acting in furtherance of Aguirre's conspiracy in regards to these substances.

For the reasons set forth below, Savannah respectfully requests that the Court impose a sentence of time served, followed by five years of supervised release, no fine and no restitution. This sentence accounts for the extraordinary circumstances in this case including Savannah's role as the primary caretaker for her severely disabled mother, the primary caretaker for her two children, and the fact that her involvement in this offense was inextricably linked to her role as an addict, and as a victim of domestic violence at the hands of her codefendant.

## II.   PSR CALCULATIONS AND OBJECTIONS

Savannah objects to the base offense level set out by the PSR, objects to the inclusion of the methamphetamine, fentanyl and fentanyl analogue seized on October 6, 2021 as relevant conduct, as well as several weapons related enhancements reflected in the PSR. In her PSR objections, Savannah also categorically denies trafficking weapons. (see PSR Objections, pg. 4).

The PSR determined Savannah's base offense level to be 36, based on converted drug weight for methamphetamine, fentanyl and fentanyl

analogue. For ease of reference, the PSR Guideline calculation as to converted drug weights is set forth below.

| Drug Name | Drug Quantity | Converted Drug Weight |
|---|---|---|
| Methamphetamine (actual) | 105.09 gm | 2,101.80 kg |
| Methamphetamine (actual) | 298.2 gm | 5,964.00 kg |
| Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide) | 0.108 gm | 270.00 gm |
| Methamphetamine (actual) | 493.5 gm | 9,870.00 kg |
| Fentanyl Analogue | 1.024 gm | 10.24 kg |
| Methamphetamine (actual) | 2230.8 gm | 44,616.00 kg |
| **Total** | | **62,562.31 kg** |

As to the firearms offense, Count II, the base offense is 20 because at least one of the weapons was semi-automatic U.S.S.G. § 2k2.1(a)(4)(B(i)(I).

The PSR dictates that Savannah receives a four-level increase based on the number of firearms. U.S.S.G. § 2k2.1(b)(1)(B). Although several of the firearms (including the pink one in her bedroom and the Glock belonging to her deceased brother) were not part of the crime at issue, if there are at least 8 but less than 25 guns involved, the four-level increase applies.

Another four-level increase alleges Savannah engaged in the trafficking of firearms pursuant to U.S.S.G. § 2k2.1(b)(5). There is yet another four-level increase because a firearm was used in connection with a felony offense, which was the drug trafficking conduct. U.S.S.G. §2k2.1(b)(6)(B).

Under the grouping rules pursuant to U.S.S.G. § 3D1.2, the drug and gun counts cannot be grouped. An adjusted offense level is calculated after the enhancements are applied, which was 32 for the gun count. The multiple count adjustment levies a two point increase due to the number of units assigned in the adjusted offense level table. These two points are ultimately added to the greater of the adjusted offense levels, which is 36, resulting in an offense level of 38 prior to the three point reduction for acceptance of responsibility under U.S.S.G. §3E1.1(a) and U.S.S.G. §3E1.1(b).

After applying these adjustments to the base level offense of 36, the PSR determined Savannah's total offense level to be 35, with a final criminal history score of zero. Savannah has a criminal history category of I. PSR ¶¶ 65-66. Savannah's resulting guideline range is 168-210 months. PSR ¶ 112.

In lieu of the calculation in the PSR, Savannah proposes that she be held accountable for 28 grams of methamphetamine *actual*, which represents a reasonable amount directly attributable to the criminal conduct she knowingly undertook prior to her withdrawal from the conspiracy.

In that case, Savannah's base offense level for the drugs would be 26. If the adjusted offense level for the guns removes the four-point trafficking enhancement, the adjusted offense level would be 28. The gun offense would have the higher adjusted offense level and increasing the offense level by the number of units, Savannah's new adjusted offense level would be 30. From there she would receive a three-level reduction for acceptance and timely notification of plea resulting in an offense level of 27. In that case her guideline range would be 70-87 months. If given the additional four-level reduction as a minimal participant, her total offense level would be 23, resulting in a guideline range of 46-57 months.

### A. Savannah deserves a mitigating role adjustment as a minimal participant.

Savannah objects to being deemed an average participant in the conspiracy, which deprives her of the deserved reduction under U.S.S.G. §3B1.2(a) for being a minimal participant. Savannah is significantly less

culpable than codefendant Aguirre in this matter. U.S.S.G. §3B1.2(a) App. Note 3(A)

In order to qualify for a four-point reduction as a minimal participant in criminal activity, the court can look to Savannah's understanding of the scope and structure of the criminal activity, her own participation, her degree of decision making, exercise of discretion in committing the criminal acts and the degree to which she benefitted or stood to benefit from the criminal acts. U.S.S.G. §3B1.2, application note(c). A "minimal participant" plays a minimal role in the criminal activity and is the least culpable of those involved in the conduct of a group.

Here, Savannah's lack of understanding of Aguirre's enterprise combined with her fear of making inquiries of Aguirre about his criminal activity show that she was a minimal participant. The evidence, and Savannah's allocution, demonstrate that she was trading Aguirre's methamphetamine for pills for her own personal use. PSR ¶ 23.

Savannah had no hand in distributing the large quantities that Aguirre was dealing with, and she only facilitated a few small transactions trading personal use amounts with others. Savannah was unaware that Aguirre was storing large quantities of drugs in the storage area of her home at the time of her arrest in October, 2021. This is also why Savannah asks that the Court

only hold her accountable for the amounts she personally distributed, instead of the 7 lbs. of methamphetamine and fentanyl products that Aguirre was hauling around.

Savannah and her children received no benefit from Aguirre's dealings. Savannah was forced to rely on her legitimate income, housing subsidies and other public benefits to support the family. She had no fancy car, no home of her own, no fine jewelry, clothes or other luxuries that one might expect to see a drug trafficker enjoy. PSR ¶ 109. These facts support a finding that Savannah was a minimal participant and should receive the four-level reduction.

### B. Savannah withdrew from the conspiracy prior to her October 2021 arrest and she should not be held responsible for the drugs seized at that time.

A conspirator can withdraw from a conspiracy in the following ways:
> (1) disavowing the unlawful goal of the conspiracy;
> (2) affirmatively acting to defeat the purpose of the conspiracy; or
> (3) taking definite, decisive, and positive steps to disassociate himself from the conspiracy.

*United States v. Kilby*, 443 F.3d 1135, 1139 (9th Cir. 2006) quoting *United States v. Fox*, 189 F.3d 1115, 1118 (9th Cir. 1999)

Here, Savannah took definite, decisive and positive steps to dissociate herself from the conspiracy. Savannah and Aguirre had been living together at the Pullman Court address, which was secured through Savannah's federal housing benefits. PSR ¶ 80. In May, 2021, Smith fled Aguirre after he

strangled her, pulled her around the ground by her hair and threatened to take the children to California. PSR ¶¶ 27, 82. Savannah needed a family member to get her children back from Aguirre, and once she got them back, she fled with the children to a women's shelter. PSR ¶ 81. The information involving the assault is corroborated by Savannah's new housing application submitted on June, 17, 2021. Exhibit B, Smith HUD-5382.

In order to best extricate herself from the lifestyle and conspiracy, Savannah quit doing pills and enrolled herself in a suboxone program. PSR ¶¶ 85, 96-98. Savannah obtained a new residence where Aguirre was not listed on the lease, and would not be entitled to stay. PSR ¶ 27.

Aguirre came back into the picture when he demanded that Savannah drive him to California to get surgery. PSR ¶¶ 27, 82. Savannah is still unaware whether Aguirre purchased drugs during that trip to California, or if the drugs were already sitting in Aguirre's storage tubs when they returned.

To avoid being assaulted in front of her children, Savannah knew she was not welcome to ask any questions. Unlike many defendants who only clean up after they are arrested, Savannah made the necessary changes prior to her arrest. Unfortunately, Aguirre would not let her escape his grasp and his dictatorship.

### C. Savannah did not engage in the trafficking of firearms under U.S.S.G. § 2k2(b)(5).

As to the enhancement under U.S.S.G. § 2k2.1(b)(5), while Savannah does not dispute that she purchased a number of firearms later found to be in the possession of others, she denies having knowledge that her weapons were "trafficked." PSR ¶¶ 48, 75.

Aguirre took advantage of Savannah's love for guns and her gun "hoarding" behavior and Savannah was unknowingly used as a straw man purchaser. She had so many guns around the house it was hard to keep track of them all. On the date of arrest, 21 guns were removed from Savannah's home. PSR ¶ 34. Like many Montanans, Savannah fancied herself as a collector and although her love for guns came from a place of personal tragedy, (see *infra* pg 13) at the time of arrest Savannah was already voluntarily engaged in a suboxone program and she was not an addict.

When "a sentencing factor would have an extremely disproportionate effect on the sentence, the government may have to satisfy a clear and convincing standard of proof." *United States v. Kilby*, 443 F.3d 1135, 1140 n.1 (9th Cir. 2006).

Because this enhancement drives her guidelines up from 108-135 to 168-210, the government should bear the burden of establishing this fact by

clear and convincing evidence. The circumstantial evidence that Savannah's guns were found to be in the possession of strangers in California is not enough to meet this burden.

### D. Savannah should not be held accountable for all of Aguirre's drugs.

Text messages provided in discovery demonstrated that Savannah traded methamphetamine for opioid pills that she ultimately took for personal use. In one of the messages, Savannah references being "pill sick," indicating the was experiencing opioid withdrawals. PSR ¶ 23.

Savannah should only be held accountable for drug types and quantities that were foreseeable in the scope of the conspiracy in which she participated, and which are reasonably attributable to her. Savannah withdrew from the conspiracy, got her life cleaned up and then was coerced and manipulated to drive Carlos Aguirre to California for his dental surgery.

The evidence in this case establishes that codefendant Aguirre maintained a residence in California. PSR ¶ 22. There is no evidence that Savannah was aware of this second residence, and she has insisted the same. During Savannah's recent trip to California which was done at Carlos' demand so that he could obtain dental surgery, Savannah stayed with Carlos' mother while Carlos stayed with his brother. *Exhibit A*, Dr. Scolatti Evaluation, pg 8., PSR ¶¶ 27, 82. Aguirre, on the other hand, repeatedly

traveled to California over the years. PSR ¶ 23. Savannah had no means, contacts or resources to distribute anything other than personal use quantities.

These facts paired with her attempt to withdraw from the conspiracy support the request that Savannah should only be held accountable for distribution of 28 grams of methamphetamine.

### III. Mitigating factors support the requested sentence of time-served.
#### A. Savannah has a history of unresolved trauma.

Savannah's oldest brother Gentry was in a serious car accident before his suicide. PSR ¶ 76. Savannah watched her brother deteriorate into a bout of depression from which he never emerged. *Id.* Savannah's brother ultimately left his three young children fatherless when he committed suicide by shooting himself in the head when Savannah was 27. *Id.* Savannah later found a chunk of her brother's skull on the floor. Exhibit A, Dr. Scolatti Evaluation, pg 7.

Savannah coped with her 30-year-old brother's suicide by finding comfort in a passion they both shared—guns. Savannah's aunt Lenora describes Savannah as a gun "hoarder." PSR ¶ 75. Savannah would borrow money from friends and family to purchase the guns. *Id.*

### B. Savannah is a victim of domestic violence and her criminal behavior is the produce of duress.

Even when Savannah and Aguirre were getting along, Savannah's actions in regards to his crimes were done under duress. Savannah is eligible for a departure pursuant to U.S.S.G. § 5K2.12

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.

U.S.S.G. § 5K2.12

Dr. Michael Scolatti evaluated Savannah and diagnosed her with posttraumatic stress disorder based on abuse she suffered at the hands of her codefendant. The evaluation is filed under seal.

Dr. Scolatti opines that Savannah has unresolved grief and could benefit from counseling due to the grief, and the abuse she suffered at the hands of Aguirre. Dr. Scolatti supports the recommended sentence of time-served, largely due to Savannah's success with compliance, and her lack of

criminal history. Exhibit A, pg. 15. Savannah reserves the right to call Dr. Scolatti at her sentencing hearing.

### C. Savannah should receive a departure or variance because she is an irreplaceable caretaker for her mother and children.

Savannah's mother, Delorah, recently suffered a second stroke. This information is not included in the PSR as it was unknown to the parties at the time the PSR was finalized. From her prior stroke, Delorah lost the ability to move the right side of her body, but could still use her left side. The new stroke has rendered Delorah unable to use either side of her body. She is unable to even hold a spoon at this time.

Savannah should receive a departure due to her role as an irreplaceable caregiver for her mother. Savannah has been employed as her mother's caregiver since 2009. PSR ¶ 73, 105. Prior to her mothers' recent stroke, which has required hospitalization and institutionalization, Savannah attended to all of her daily needs. In addition to the caretaking role, Savannah is currently her mother's healthcare proxy and advocate.

It is permissible for the Court to grant a downward departure pursuant to § 5H1.6 when the defendant is "an irreplaceable caretaker of...seriously ill family members." *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003). When engaging in the § 5H1.6 analysis, "courts should assess the nature of

the care that the defendant provides to his or her family members and determine whether 'there are feasible alternatives of care that are relatively comparable' to the defendant's." *United States v. Menyweather*, 447 F.3d 625, 633 (9th Cir. 2006) quoting *United States v. Roselli*, 366 F.3d 58, 68-69 (1st Cir. 2004).

Also instructive are the application notes to § 5H1.6 which sets forth factors that shall be considered including:

(i) The seriousness of the offense.

(ii) The involvement in the offense, if any, of members of the defendant's family.

(iii) The danger, if any, to members of the defendant's family as a result of the offense. U.S.S.G. § 5H1.6, application note 1(A).

In *Aguirre*, the district court granted a downward departure under U.S.S.G. § 5H1.6 when the defendant's child would have been left with no custodial parent should the mother go to prison. *United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir. 2000). The Ninth Circuit upheld the departure, recognizing the discretion given to the district court in determining whether a case falls outside the "heartland" and is worthy of such treatment. District courts are to consider the following factors when departing from the Guidelines:

> 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual case?
> 2) Has the Commission forbidden departures based on those features?
> 3) If not, has the Commission encouraged departures based on those features?
> 4) If not, has the Commission discouraged departures based on those features?

*United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir. 2000)

Currently, Delorah is residing in a rehabilitation center. If medically able to return home, which is a possibility, Delorah will need even more intensive care than before. Savannah previously did all of her shopping, cooking, cleaning, and bathing.

Savannah's is not just an informal caretaker for her mother, she is employed through the CSKT Tribe's Elder Care Program. ¶¶73, 105. Savannah is also the primary caretaker for her two young children, and their father —Savannah's codefendant— anticipates spending the next 15-years in federal prison as a result of his crimes.

Under the guidelines, the issue of family responsibilities can only be considered when such issue "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *United States v. Menyweather*, 447 F.3d 625, 632 (9th Cir. 2006) quoting *Koon v. United States*, 518 U.S. 81, 96, 116 S. Ct. 2035, 2045 (1996).

DEFENDANT SAVANNAH SMITH'S SENTENCING MEMORANDUM                                    17

The Court may grant a downward departure pursuant to U.S.S.G § 5H1.6 when the defendant is "an irreplaceable caretaker of…seriously ill family members." *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003).

In this situation, Savannah concedes that her offenses are serious; however, Savannah's mother was not involved in her offense, and was not placed in danger due to the offense. Savannah has a clean criminal record and has been compliant with conditions of release since this case began.

The application notes are further instructive when the departure consideration is based on loss of caretaking:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
>
> (iv) The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, Application Note 1(B)

The hardships that Delorah will face are best summarized in her letter to this Court,

> Savannah cooks, cleans, does laundry, drives me to all my appointments, helps me bathe, shovels the snow in winter and mows the grass in summer. I depend on her for everything. I have two other daughters, one suffers from ptsd and social anxiety disorder, the youngest is married and lives with the father of her son, her son was recently diagnosed with autism.

Letter from Delorah Liberty, August 8, 2022, DOC. (Doc. 78).

Savannah is an irreplaceable provider for her mother due to the comprehensive nature of the assistance she provides. Delorah's letter also shows that her other children have not been providing for her, and that they would not be suitable candidates for the job. The requested departure would address the loss of caretaking by allowing Savannah to remain as the primary caregiver for her mother, as well as her two children who will also be without a caretaker if Savannah is incarcerated.

Savannah will continue to show respect for the law and for this Court if given the opportunity to continue caring for her family and avoid prison.

Dated this 16th day of December, 2022.

_/s/ Sarah Lockwood_
Sarah Lockwood
*Attorney for Savannah Smith*

## **CERTIFICATE OF SERVICE**

    I hereby certify that, on this 16th day of December, 2022, a copy of the foregoing document was served on the following persons by the following means:

<u>1</u>        CM/ECF

    Jennifer Clark, Esq.
    Assistant U.S. Attorney

<u>2</u>        CM/ECF

    Clerk of Court
    U.S. District Court

                                        <u>/s/ Sarah Lockwood</u>
                                        Sarah Lockwood